IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

UNITED STATES OF AMERICA,
     Petitioner,

v.                          CASE NO.: 5:08-HC-2070

GARY LANGE,
     Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

The United States seeks to commit Respondent, Gary Dean Lange, as a "sexually dangerous person" under the civil commitment provisions of the Adam Walsh Child Protection and Safety Act of 2006 (the Act), Pub. L. No. 109-248, 120 Stat. 587 (codified as amended in scattered provisions of 18 and 42 U.S.C.).

To commit Respondent, 18 U.S.C. § 4248 requires the government to prove by clear and convincing evidence that the Respondent is a "sexually dangerous person." Under the Act, a "sexually dangerous person" is one who "has engaged or attempted to engage in sexually violent conduct or child molestation and . . . is sexually dangerous to others." 18 U.S.C.A. § 4247(a)(5)(West Supp. 2012). To determine whether a person is "sexually dangerous to others," a court must determine two things: First, whether that person "suffers from a serious

mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6).  Second, if a court finds that the person "suffers from a serious mental illness, abnormality, or disorder," the court must then find that the mental illness, abnormality, or disorder would cause that person to have "serious difficulty refraining from sexually violent conduct or child molestation if released."  Id.

This court held an evidentiary hearing in this matter on September 11 and 12, 2012.  At the hearing, the United States presented testimony from Ms. Charmaine Meagher; Ms. Jean Lange; Respondent Gary Lange; Dr. Harry Hoberman, PhD; and Dr. M. Lela Demby.  Respondent presented testimony from Dr. Joseph J. Plaud, PhD.  The United States offered sixteen exhibits into evidence and Respondent offered twelve.  All exhibits were admitted. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

<u>**FINDINGS OF FACT**</u>

**A. Procedural Facts**

1.   On April 8, 2008, the Bureau of Prisons certified Respondent Gary Dean Lange as a sexually dangerous person under the Act.  Doc. No. 1-1.

2.  On January 26, 2011, Respondent filed a Motion for a
    Hearing to determine whether Respondent qualifies as a
    "sexually dangerous person" under the Act.  Doc. No. 27.

3.  On May 6, 2011, Magistrate Judge James E. Gates granted
    Respondent's Motion for a Hearing.  Doc. No. 35.

4.  On June 1, 2012, Chief Judge James C. Dever III set the
    evidentiary hearing in this matter for September 11, 2012.
    Doc. No. 72.

**B. Respondent's Non-Sexual Criminal History**

5.  Respondent was born in November 1956.  Govt. Ex. 10, at
    424.

6.  In January 1976, at age 19, Respondent was convicted of
    Theft of Over $150 and sentenced to two years probation.
    Trial Testimony of Respondent Gary Dean Lange, September
    11, 2012, Tr. at 49 ("Lange, Tr. at _____"); Government's
    Exhibit No. 7, at 167 ("Govt. Ex. _____, at _____").

7.  In August 1976, again at age 19, Respondent was convicted
    of Aggravated Battery and Resisting Arrest.  He was
    sentenced to twenty-one days in county jail.  Lange, Tr. at
    49-50; Govt. Ex. 7, at 167.

8.  Also in 1976, Respondent was convicted of Reckless Driving
    and was fined.  Govt. Ex. 7, at 169.

9.  In 1977, at approximately age 20, Respondent was convicted
    of Driving on a Suspended License and Illegal

3

Transportation of Alcohol and was fined.  Govt. Ex. 7, at
169.

10.  In December 1978, at age 22, Respondent was convicted of
Criminal Damage to Property and was fined $100 plus costs.
Lange, Tr. at 50; Govt. Ex. 7, at 167.

11.  In May 1979, again at age 22, Respondent was convicted of
Unlawful Use of a Weapon and was sentenced to six months
incarceration.  Id.

12.  In August 1980, at age 23, Respondent was convicted of
Unlawful Use of a Weapon and Reckless Conduct and was
sentenced to 364 days incarceration.  Lange, Tr. at 51;
Govt. Ex. 7, at 167.

13.  The 1980 offense arose out of a bar fight where, after the
fight had escalated, Respondent left the bar, travelled to
his apartment to retrieve a shotgun, then returned to the
bar and shot two individuals.  Lange, Tr. at 51-54; Govt.
Ex. 7, at 167.

14.  Also in 1980, Respondent was convicted of Driving Under the
Influence and was fined.  Govt. Ex. 7, at 169.

15.  In February 1983, at age 26, Respondent was convicted of
Unlawful Use of a Weapon and was sentenced to ninety days
incarceration.  Lange, Tr. at 54; Govt. Ex. 7, at 168.

16. In June 1985, at age 28, Respondent was convicted of Unlawful Use of a Weapon and Impersonating a Police Officer. Lange, Tr. at 55-57; Govt. Ex. 7, at 168.

17. The 1985 weapons offense involved Respondent demanding alcohol from a liquor store clerk by threatening the clerk with a knife. Lange, Tr. at 55. Respondent received one year of probation for this offense. Govt. Ex. 7, at 168.

18. The 1985 impersonation offense involved Respondent impersonating a game warden, instructing individuals to leave a fishing area that Respondent frequented. Lange, Tr. at 57; Govt. Ex. 7, at 168.

**C. Respondent's Sexual Criminal History**

19. In June 1986, at age 29, Respondent was arrested for Public Indecency for exposing himself in a city park. Govt. Ex. 7, at 168. The State declined to prosecute this charge in connection with Respondent's plea to a probation violation. Id.

20. In 2008, Respondent gave a deposition in a civil lawsuit he had filed against the Diocese of Springfield in Illinois for sexual abuse he alleges to have suffered by Catholic priests as a child.

21. In his 2008 deposition, Respondent stated he was evaluated after being charged with sexually abusing an eight-year-old boy who was fishing by a river in 1984. Govt. Ex. 10, at

458-59.  Respondent reported that a passerby saw the abuse and reported it.  Id. at 459.  The charges were ultimately dropped.  Id.

22. In July 1987, at age 30, Respondent was convicted of Aggravated Criminal Sexual Abuse for fondling two minor children and was sentenced to four years and six months incarceration.  Lange, Tr. at 61-62; Govt. Ex. 7, at 168.  Both children were under thirteen years of age.  Id. at 168.  Respondent was paroled for this offense in July 1989.  Lange, Tr. at 62.

23. The July 1987 offense occurred in a department store and the children were strangers to the Respondent.  See Govt. Ex. 15, at 1683; Lange, Tr. at 59-62.

24. When asked why he had touched the children in the department store, Respondent answered, "I was taking a chance."  Id. at 60.

25. In September 1989, at age 32, Respondent was charged with six counts of various sexual offenses against two minor females under age 13, including Aggravated Criminal Sexual Abuse and Aggravated Battery.  Govt. Ex. 7, at 168.  Respondent received four years incarceration for this offense, but was paroled in October 1991.  Id.

26. When asked why he had molested the two minor females, both approximately ten years old in 1989, Respondent answered,

"Like I said, I took a chance and I got caught."  Lange,
Tr. at 66.

27.    In June 1994, at age 37, Respondent was convicted in
Illinois state court of Aggravated Sexual Assault against
his six-year-old nephew at Respondent's mother's home.
Lange, Tr. at 71-72; Govt. Ex. 16, at 1727.  Respondent was
sentenced to twenty years incarceration.  Id.

28.    In August 1994, at age 37, Respondent was convicted of
Aggravated Sexual Abuse, in violation of 18 U.S.C. §
2241(c), against an eleven-year-old boy who, after
Respondent befriended and married the boy's mother, became
Respondent's son-in-law.  Lange, Tr. 72-73.

29.    Respondent was sentenced to 204 months incarceration and
four years supervised release by a federal court.  Govt.
Ex. 6, at 1898; Govt. Ex. 7, at 163.[1]

**D. Respondent's Institutional Conduct**

30.    In October 2005, at age 48, Respondent was investigated at
the Federal Correctional Institution at Pekin, Illinois
("FCI Pekin") for "engaging in behavior(s) . . . towards
another inmate . . . that may [have been] predatory in
nature."  Govt. Ex. 12, at 1578; Lange, Tr. at 79.

---

[1] The 20-year state sentence and 204-month federal sentence ran
concurrently.  Resp. Ex. 8, at 6.

31. Dr. Steven A. Thomas, a psychologist working at FCI Pekin during the October 2005 investigation, described the other inmate involved as "very naïve, rather slow cognitively, and a possible target for predatory inmates" as well as "younger." Govt. Ex. 12, at 1578; Govt. Ex. 13, at 1577.

32. During his interview with Dr. Thomas regarding the October 2005 investigation, Respondent admitted to buying the inmate shoes and a watch "as a wedding present" as well as sending the inmate's father $100 to purchase art supplies for the inmate. Govt. Ex. 12, at 1578.

33. While testifying at the evidentiary hearing, Respondent admitted that he and the inmate from the October 2005 investigation had engaged in sexual behavior, though Respondent described any such encounter as consensual. Lange, Tr. at 79-80. Sexual conduct between inmates violates Bureau of Prisons rules. Trial Testimony of Dr. M. Lela Demby, PhD, September 12, 2012, Tr. at 290 ("Demby, Tr. at ____").

34. In October 2011, Respondent was involved in sexual conduct with detainee Gerald Timms, who is also housed in the "Maryland Unit" at Federal Correctional Institution at Butner, North Carolina ("FCI Butner"). Lange, Tr. at 80-82.

35. Respondent was formally sanctioned for obscuring a security camera during the October 2011 incident. Demby, Tr. at 281; Lange, Tr. at 81-82. Respondent alleged he obscured the security camera under threat of harm and offered pictures of bruises he sustained as proof of the sexual assault he alleges occurred against him. Lange, Tr. 81-82; Resp. Ex. A & B. The court discounts Respondent's testimony regarding the alleged assault in light of the many inconsistencies present in the Respondent's testimony as a whole. Moreover, the court discounts the exhibits Respondent offered to support his assault allegation as they alone were inconclusive on the issue of whether an assault in fact occurred.

36. Respondent has expressed a desire to form a business venture with fellow inmates, including at least one sex offender. Lange, Tr. at 115-17; Govt. Ex. 12, at 1578.

37. Regarding his post-release business plans, Respondent violated prison rules by both selling art objects while in prison and attempting to transfer funds to another Maryland Unit sex offender for the same purpose. Lange, Tr. at 116; Demby, Tr. at 281.

**E. Respondent's Mental Health**

38. Respondent has a history of mental health treatment prior
    to his confinement in federal prison,[2] beginning in 1970
    when he was hospitalized in the Mental Health Center in
    Alton, Illinois for "difficulty controlling [his] sexual
    behavior." Govt. Ex. 2, at 2159 (internal quotations
    omitted).

39. Respondent was formally diagnosed with Atypical Paraphilia
    (with some elements of Pedophilia present) as early as
    1987. Govt. Ex. 11, at 845.

40. All expert witnesses in this matter, including Respondent's
    witness Dr. Joseph Plaud, have essentially diagnosed
    Respondent with Pedophilia. Trial Testimony of Dr. Harry
    Hoberman, PhD, September 11, 2012, Tr. at 139 ("Hoberman,
    Tr. at ____"); Demby, Tr. at 257; Trial Testimony of Dr.
    Joseph Plaud, PhD, September 12, 2012, Tr. at 364-65
    ("Plaud, Tr. at ____").[3]

---

[2] The record is replete with various mental health diagnoses for
Respondent, perhaps spanning much of the Diagnostic and
Statistical Manual. The court intentionally focuses on those
aspects of Respondent's mental health history that are most
relevant to the second prong of the Act's three-prong test to
determine Respondent's status as a "sexually dangerous person."

[3] Dr. Plaud also testified that he participates as a "scholar" in
"healthy debates" as to whether a Pedophilia diagnosis should
persist throughout a patient's lifetime. Nonetheless, Dr. Plaud
admitted that Respondent met all diagnostic criteria for
Pedophilia.

41. The court finds by clear and convincing evidence, based on Respondent's mental health records, as well as each of the expert witness's testimony and written evaluations, that Respondent currently suffers from Pedophilia as defined by the Diagnostic and Statistical Manual, Fourth Edition, Text Revision (DSM-IV-TR).

42. Respondent was formally diagnosed with Antisocial Personality Disorder as early as October 18, 1993.  Govt. Ex. 11, at 852.

43. Both of the United States' expert witnesses in this matter have diagnosed Respondent with Antisocial Personality Disorder.  Hoberman, Tr. at 139; Demby, Tr. at 257. Respondent's expert witness, however, did not diagnose Respondent with Antisocial Personality Disorder.  Plaud, Tr. at 354.

44. For reasons more fully discussed below, the court finds by clear and convincing evidence, based on Respondent's mental health records, as well as each of the expert witness's testimony and written evaluations, that Respondent currently suffers from Antisocial Personality Disorder as defined by the Diagnostic and Statistical Manual, Fourth Edition, Text Revision (DSM-IV-TR).

**F. Evaluation of Government's Expert Dr. Harry Hoberman**

45. Dr. Harry Hoberman is a licensed psychologist, who has evaluated numerous sex offenders to determine whether they are sexually dangerous persons under the Act. Hoberman, Tr. at 123.

46. Dr. Hoberman has testified as an expert in forensic psychology within the Eastern District of North Carolina as well as in several state courts regarding the dangerousness of sexual offenders. Hoberman, Tr. at 125-26.

47. Dr. Hoberman's curriculum vitae is Government's Exhibit 1.

48. Dr. Hoberman's written forensic evaluation of Respondent, dated June 13, 2011, is Government's Exhibit 2. His written supplemental evaluation dated April 14, 2012 is Exhibit 3. Dr. Hoberman opined, both in his evaluation reports and during his testimony in the evidentiary hearing, that Respondent met the Act's criteria for civil commitment. Govt. Ex. 2, at 2207; Govt. Ex. 3, at 2319; Hoberman, Tr. at 129.

49. In forming his opinion that Respondent met the Act's criteria for civil commitment, Dr. Hoberman considered the documents referenced in his report as well as additional information related to Respondent's criminal, medical, social, and substance abuse histories obtained through direct interviews with Respondent. Hoberman, Tr. at 130.

50. Dr. Hoberman determined that Respondent had previously committed or attempted to commit child molestation as defined by 28 C.F.R. § 549.93, citing Respondent's sexual offense convictions, investigatory records, out-of-court admissions, and institutional behavior. Hoberman, Tr. at 131; see generally Govt. Ex. 2, 3.

51. Dr. Hoberman diagnosed Respondent with, inter alia, Pedophilia, sexually attracted to male and female, non-exclusive type and Antisocial Personality Disorder. Hoberman, Tr. at 139; Govt. Ex. 2, at 2181-83.

52. To determine whether Respondent would have serious difficulty refraining from sexually violent conduct or child molestation, Dr. Hoberman used several risk assessment tools, including those that examine both static and dynamic risk factors for re-offense.

53. Dr. Hoberman used three actuarial risk assessment tools aimed mainly at examining static risk factors for re-offense. First, Dr. Hoberman used the STATIC-99, which is a ten-item risk assessment actuarial that looks at reconvictions over approximately a fifteen-year period after release. Hoberman, Tr. at 151. Second, he used the Minnesota Sex Offender Screening Tool—Revised (MnSOST—R), which is a sixteen item risk assessment actuarial that examines re-arrests for new hands-on sexual offenses over a

six-year period after release. <u>Id.</u> at 151-52. Third, Dr. Hoberman used the Sex Offender Risk Appraisal Guide (SORAG), which is a fourteen-item risk assessment actuarial that uses violent recidivism as a proxy for sex offense recidivism. <u>Id.</u> at 152.

54.   Dr. Hoberman testified that each of the risk assessment actuarials he used to evaluate Respondent's risk of re-offending after release was peer-reviewed. <u>Id.</u> at 155. Moreover, Dr. Hoberman testified that each actuarial he used had been studied by researchers other than the developers of the actuarials and that those studies had been published. <u>Id.</u> Ultimately, Dr. Hoberman testified that each of the actuarials he used was "readily accepted by those in [his] field for purposes of risk assessment." <u>Id.</u>

55.   Dr. Hoberman further testified that each of those risk assessment actuarials placed Respondent in high-risk categories for re-offending. Under Dr. Hoberman's administration of the tests, Respondent scored a 10 on the STATIC-99, which associates with a fifty-two percent likelihood of reconviction for a new sexual offense over a fifteen-year period following release. <u>Id.</u> Respondent similarly placed in the high category on the MnSOST—R, which associates with a seventy-two percent risk of re-

arrest for a sex offense over six years following release. Id. at 158. Finally, Respondent placed in the second-highest risk category on the SORAG, which associates with an eighty-nine percent risk of violent re-offense over ten years following release. Id. at 159. Ultimately, Dr. Hoberman concluded that Respondent's consistently high scores across each of the risk assessment actuarials characterizes the Respondent with a high risk of future sexual offending. Id. at 160.

56. In addition to risk assessment actuarials, Dr. Hoberman used risk management instruments to assess Respondent's risk for sexual re-offense as well. Dr. Hoberman used a method of risk management known as "structured professional judgment" (SPJ). Id. SPJ-based psychological instruments have two salient characteristics. First, these instruments provide a discrete set of offender characteristics or domains from which the professional may evaluate the offender. Id. Second, the professional using an SPJ-based instrument then determines which, if any, of the pre-determined characteristics apply to the person being evaluated. Id. Essentially, the former aspect of SPJ instruments makes them "structured"; the latter provides the flexibility inherent in professional judgment.

57. Dr. Hoberman used two SPJ-based instruments to assess Respondent's risk of re-offense—the Sexual Violence Risk—20 (SVR-20) and the Psychopathy Checklist—Revised (PCL—R). Id. at 162.

58. The SVR—20 lists twenty variables associated with sex offense recidivism risk, id. at 161, and recent peer-reviewed research demonstrates that the SVR—20 has similar predictive accuracy to actuarial measures. Govt. Ex. 2, at 2203.

59. Regarding his use of the SVR—20 in this case, Dr. Hoberman found that seventeen of the twenty risk factors listed in the SVR—20 characterized Respondent. Hoberman, Tr. at 162. Both the presence of a vast majority of the SVR—20's risk factors as well as Respondent's score on the instrument indicate a high risk of sexual re-offense. Govt. Ex. 2, at 2204.

60. Regarding the PCL—R, Dr. Hoberman found that Respondent, based on the information available through records as well as Respondent's interview presentation, scored right at the "research cutoff for demarcating someone as a quote, psychopath, unquote." Hoberman, Tr. at 165. Dr. Hoberman testified that evaluating an individual's degree of psychopathy is helpful from a diagnostic perspective—it identifies a subgroup of persons with Antisocial

Personality Disorder who are more likely to commit future sex offenses—and from an empirical perspective—individuals with higher PCL—R scores associate with a greater likelihood of future sexual offending. Id.

61. In addition to assessing Respondent's static risk factors for future sexual offending, Dr. Hoberman examined Respondent's "dynamic risk factors," or psychological characteristics that might change over time in order to determine whether Respondent would benefit from treatment and general risk management. Id. at 166.

62. To assess Respondent's dynamic risk factors, Dr. Hoberman used the Structured Risk Assessment—Forensic Version (SRA—FV) to examine three different areas: (1) sexual interests, (2) relational style, and (3) general self-management. Id.

63. According to Dr. Hoberman, Respondent's SRA-FV results indicate Respondent needs "exceptional levels of risk management." Id. at 167.

64. Based on all of the risk scales applicable to Respondent, Dr. Hoberman opined that Respondent satisfies the Act's "serious difficulty refraining" prong because Respondent poses such a high risk for sexual re-offense and presents extreme need for risk management. See Govt. Ex. 2, at 2206.

**G. Evaluation of Government's Expert Dr. M. Lela Demby**

65. Dr. M. Lela Demby is a sex offender forensic psychologist, employed by the United States Public Health Service and stationed at FCI Butner. Demby, Tr. at 238-39. Dr. Demby has testified as an expert in forensic psychology in federal court several times. See id. at 248.

66. Dr. Demby's curriculum vitae is Government's Exhibit 4.

67. Dr. Demby's initial forensic evaluation of Respondent, dated March 7, 2008, is Government's Exhibit 5. Her updated forensic evaluation, dated March 18, 2011, is Government's Exhibit 6.

68. Dr. Demby opined, both in her updated forensic evaluation and during her testimony in the evidentiary hearing, that Respondent met the Act's criteria for civil commitment. Govt. Ex. 6, at 1909; Demby, Tr. at 251.

69. In forming her opinion that Respondent met the Act's criteria for civil commitment, Dr. Demby examined substantially the same material that Dr. Hoberman examined. However, unlike Dr. Hoberman, Dr. Demby could not conduct a personal interview with Respondent because, on advice of counsel, Respondent would not consent to an interview. Id. at 250-51.

70. Dr. Demby determined that Respondent had previously committed or attempted to commit child molestation as

defined by 28 C.F.R. § 549.93, citing Respondent's sexual

offense convictions, investigatory records, out-of-court

admissions, and institutional behavior. Id. at 252-53.

71. Dr. Demby diagnosed Respondent with, inter alia,

Pedophilia, sexually attracted to male and female, non-

exclusive type and Anitsocial Personality Disorder.[4] Id. at

257; Govt. Ex. 6, at 1900. In her testimony and written

report, Dr. Demby explained the bases for each of her

diagnoses and opined that each qualify as "serious mental

illnesses, abnormalities, or disorders" under the Act.

Demby, Tr. at 265; Govt. Ex. 6, at 1909.

72. To determine whether Respondent would have serious

difficulty refraining from sexually violent conduct or

child molestation, Dr. Demby used several risk assessment

tools, including those that examine both static and dynamic

risk factors for sexual re-offense.

73. The risk assessment actuarials that Dr. Demby used to

evaluate Respondent's risk of re-offense include the

STATIC—99, the STATIC—99 Revised (STATIC—99R), and the

Rapid Risk Assessment for Sex Offense Recidivism (RRASOR).

---

[4] Dr. Demby also gave Respondent various substance abuse
diagnoses. Govt. Ex. 6, at 1900, 1909. However, insofar as
substance abuse inherently impairs an individual's volitional
control, Dr. Demby noted that Respondent lacked volitional
control even while not abusing substances. Demby, Tr. at 326.

74. The RRASOR is a risk assessment actuarial that "assesses the probability of sexual recidivism in adult male sexual offenders." Govt. Ex. 5, at 1595.

75. According to Dr. Demby's updated forensic evaluation, Respondent scored an eight on the STATIC-99, a seven on the STATIC-99R (due to the one-point reduction for age that, unlike the STATIC-99, the STATIC-99R contemplates),[5] and a five on the RRASOR. Govt. Ex. 6, at 1903-05. Each of these scores places Respondent into high-risk categories as defined by each respective risk assessment actuarial. See id.

76. Unlike Dr. Hoberman, Dr. Demby characterized the SVR—20 and the PCL—R as instruments used to evaluate dynamic risk factors for sexual re-offense. Notwithstanding the experts' difference in categorization, Respondent nonetheless placed in a high-risk category on the SVR—20 as administered by Dr. Demby.[6] See id. at 1908.

---

[5] Even after entertaining the court's hypothetical point-reduction for Respondent once he reaches age 60, Dr. Demby testified that she would nonetheless have to add more points to Respondent's STATIC-99R score after hearing Respondent's testimony. Demby, Tr. at 262-63.

[6] Just as Dr. Demby testified that she would revise Respondent's STATIC-99R score upward based on Respondent's testimony, Dr. Demby likewise testified that more of the SVR—20 factors would apply as a result of Respondent's testimony than appear in Dr. Demby's report. Demby, Tr. at 270.

77. Based on Respondent's high scores on Dr. Demby's administration of the STATIC—99, STATIC—99R, RRASOR, and SVR—20, as well as Respondents' particular diagnoses of Pedophilia and Antisocial Personality Disorder, Dr. Demby opined that Respondent satisfies the Act's "serious difficulty refraining" prong. Demby, Tr. at 266; Govt. Ex. 6, at 1909.

**H. Evaluation of Respondent's Expert Dr. Joseph J. Plaud**

78. Dr. Joseph J. Plaud is a licensed psychologist and is board certified in behavioral analysis. Plaud, Tr. at 330.

79. Dr. Plaud has testified as an expert in behavioral analysis several times, both in state and federal court. Id. at 332–33.

80. Dr. Plaud's curriculum vitae is Respondent's Exhibit 1.

81. Dr. Plaud's evaluation, based both on a review of documentation and an interview of Respondent, is Respondent's Exhibit 2.

82. Dr. Plaud opined, both in his written evaluation and during his testimony, that Respondent did not meet all of the Act's criteria for civil commitment. Resp. Ex. 2, at 2.

83. Dr. Plaud agreed with Dr. Hoberman and Dr. Demby that Respondent had previously engaged in child molestation, id. at 1, presumably basing this determination on the same

historical facts that Dr. Hoberman and Dr. Demby used.  See id. at 6-7.

84. Dr. Plaud stated in his evaluation that Respondent "could be diagnosed with a sexual disorder based upon historical factors."  Id. at 1.  However, when asked whether Respondent was currently a pedophile, Dr. Plaud vacillated in his testimony stating, "I believe he meets the diagnostic criteria based on his history, yes."  Plaud, Tr. at 365.  When further pressed as to whether he would "call [Respondent] a pedophile now," Dr. Plaud responded, "You want to call him things, yes."  Id.  Nevertheless, during direct examination, Dr. Plaud did state that he "think[s] [Respondent] meets the second prong"—that Respondent has a serious mental illness, abnormality, or disease under the Act.

85. The court discounts Dr. Plaud's testimony and written evaluation insofar as both vaguely suggest Respondent may not currently suffer from Pedophilia because, in substance, Dr. Plaud reluctantly admits that Respondent meets the DSM-IV-TR's diagnostic criteria for the disease.

86. Dr. Plaud did not diagnose Respondent with Antisocial Personality Disorder for two reasons.  First, Dr. Plaud did not conclude there was sufficient evidence of a "juvenile criminal history" consistent with the diagnosis.  Id. at

354. Second, Dr. Plaud believed separating Respondent's anti-social criminal behavior from "general lifestyle instability and poly-substance abuse" would be too difficult to yield a clear Antisocial Personality Disorder diagnosis. See id. at 354-55.

87. The court finds Dr. Hoberman and Dr. Demby's testimony and written evaluations more persuasive on the issue of Respondent's Antisocial Personality Disorder diagnosis. The court disagrees with Dr. Plaud in that the record is replete with instances of Respondent's anti-social juvenile behavior, based in part on Respondent's own admissions. Moreover, while Dr. Plaud believes separating substance abuse and anti-social behavior is simply too difficult, Dr. Demby testified to instances where Respondent's anti-social behavior was clearly present without substance abuse. Demby, Tr. at 326.

88. Dr. Plaud wrote in his evaluation that "significant doubt" exists as to whether Respondent would have serious difficulty refraining from sexually violent conduct or child molestation if released. Resp. Ex. 2, at 1. Moreover, Dr. Plaud testified that he believed the court would have to make seven in-depth assumptions in order to find that Respondent would have serious difficulty

refraining from sexually violent conduct or child

molestation if released.  See Plaud, Tr. at 338-44.

89.  Dr. Plaud dismissed, either completely or in part, each of

the risk assessment actuarials used by Dr. Hoberman and Dr.

Demby.  See id. at 346-47 (stating that the STATIC-99 is

outdated); id. at 348 (stating that the STATIC-99R has a

low positive predictive value and that in any case the

instrument's negative predictive value should be used to

evaluate individuals); id. at 349 (calling the MnSOST—R

"[j]unk" and "[c]ompletely bogus," while simultaneously

noting that "Minnesota [the state that developed the

MnSOST—R] doesn't even use it anymore."); id. at 350

(stating that the SORAG is outdated and fundamentally over-

predicts sexual offense recidivism rates).

90.  Dr. Plaud also dismissed the other psychological tools used

by Dr. Hoberman and Dr. Demby to evaluate Respondent.  See

id. at 351-52 (stating that the PCL—R does not predict

sexual recidivism at all); id. at 352 (calling the SVR-20

outdated and stating that "you can come to any conclusion

with it, so I really think it's much ado about nothing.").

91.  Dr. Plaud used one risk assessment actuarial when he

evaluated Respondent—the Multisample Age-Stratified Table

of Sexual Recidivism Rates (MATS-1).  See Resp. Ex. 2, at

11; Plaud, Tr. at 353.  According to Dr. Plaud's report,

the MATS-1 uses six items from the STATIC-99R and has a "larger and more representative sample of sex offenders released from incarceration than any other actuarial tool at present." Resp. Ex. 2, at 11.

92. On Dr. Plaud's administration of the MATS-1, Respondent scored in the "High" risk category, though Dr. Plaud noted that Respondent's "current age and score range is in an area [where] over three quarters of the sexual offenders do not" sexually reoffend. Id.

93. Other than describing the MATS-1 and how Respondent performed on it, Dr. Plaud's report recites much of Respondent's past—substantially the same historical facts found in Respondent's 1994 Presentence Investigation Report and 2008 depositions related to his lawsuit against the Diocese of Springfield. See generally Resp. Ex. 2. The remainder of Dr. Plaud's report describes why Dr. Plaud believes his test of choice beats all others. See id. at 12-13.

94. The court finds Dr. Hoberman and Dr. Demby's testimony and written evaluations regarding Respondent's performance on several risk assessment tools more persuasive. After thorough review of the hearing's transcript as well as each of the expert's written evaluations, the court concludes

that Dr. Plaud's strong emphasis on Respondent's age as
risk mitigating is misplaced.

**CONCLUSIONS OF LAW**

**A. Admissibility of FCI Oxford and FCI Pekin incidents**

1.  On September 7, 2012, the court denied Respondent's first
    Motion in Limine because Respondent's reasons for excluding
    any reference to the FCI Oxford and FCI Pekin incidents did
    not satisfy Rule 104(b)'s standard for inadmissibility.
    See Doc. No. 92, at 2; Doc. No. 79, at 2 (arguing that the
    "unreliability of whether the incidents actually happened"
    makes evidence of both incidents irrelevant); see also Fed.
    R. Evid. 104(b).

2.  The nature of the FCI Oxford and FCI Pekin incidents
    clearly made them relevant under the standard provided by
    Rule 401 of the Federal Rules of Evidence.  However, the
    court declined to rule on the evidence's admissibility
    under Rule 401 and Rule 403 at the time Respondent filed
    his first Motion in Limine and during the evidentiary
    hearing.

3.  After hearing all the testimony and reviewing all the
    exhibits, the court finds that both the FCI Oxford and FCI
    Pekin incidents satisfy Rule 401's relevancy standard.

4.  However, the FCI Oxford incident was so proximate in time
    and nature to the offense that led to Respondent's federal

incarceration that considering it in evidence would be
redundant.  Accordingly, pursuant to Rule 403 of the
Federal Rules of Evidence, the court finds that the
cumulative nature of the FCI Oxford incident substantially
outweighs its probative value and therefore excludes any
reference to the FCI Oxford incident from evidence.

5.    However, no Rule 403 exclusionary principles substantially
      outweigh the FCI Pekin incident's relevancy and the court
      therefore admits testimony and exhibits relating to that
      incident into evidence.

**B. Respondent has engaged in or attempted to engage in sexually violent conduct or child molestation**

1.    Bureau of Prisons regulations governing civil commitment
      standards for sexually dangerous persons define "child
      molestation" as "any unlawful conduct of a sexual nature
      with, or sexual exploitation of, a person under the age of
      18 years."  28 C.F.R. § 549.93.

2.    Respondent's criminal history, as offered into evidence by
      the government, reveals multiple convictions, arrests, and
      admissions of child molestation as defined by Bureau of
      Prisons regulations.

3.    Respondent admitted on the witness stand to committing
      child molestation as defined by Bureau of Prisons
      regulations.

4.  Accordingly, the government has established by clear and convincing evidence that Respondent has engaged in or attempted to engage in acts of child molestation and the court so finds.

## C. Respondent is "sexually dangerous" to others.

### i. Respondent suffers from a serious mental illness, abnormality, or disorder.

1.  A mental illness, abnormality, or disorder "need not necessarily be one so identified in the DSM in order to meet" the civil commitment requirements embodied by 18 U.S.C. § 4247(a)(6). <u>United States v. Carta</u>, 592 F.3d 34, 40 (1st Cir. 2010). The Act does not even require the medical community's consensus as to what constitutes a "serious mental illness, abnormality, or disorder." <u>Id.</u>

2.  The court concludes that Pedophilia and Antisocial Personality Disorder satisfy the Act's standard for what qualifies as a "serious mental illness, abnormality, or disorder." The court so concludes based both on the DSM-IV-TR's description of the illnesses as well as the illnesses' impact on Respondent's life as evidenced by the record.

3.  Accordingly, since the court has found by clear and convincing evidence that Respondent suffers from both Pedophilia as well as Antisocial Personality Disorder, the

government has satisfied its burden on this element as
well.

**ii. If released, Respondent would have serious difficulty
refraining from sexually violent conduct or child
molestation as a result of his serious mental illnesses.**

1.  When analyzing the "serious difficulty refraining" prong in
    § 4248 civil commitment cases, a court must bear in mind
    the constitutional constraints on the civil commitment
    scheme.  In Kansas v. Crane, 534 U.S. 407 (2002), the
    Supreme Court held that in order to civilly commit someone
    for sexual dangerousness, "there must be proof of serious
    difficulty in controlling [one's own] behavior."  Id. at
    413.  The government need not show an absolute lack of
    control, id. at 411, but there must be some lack-of-control
    determination.

2.  In Crane, the Court reasoned that a lack-of-control
    determination is necessary to distinguish a "dangerous
    sexual offender subject to civil commitment 'from other
    dangerous persons who are perhaps more properly dealt with
    exclusively through criminal proceedings.'"  Id. at 412
    (quoting Kansas v. Hendricks, 521 U.S. 346, 360 (1997)).
    Otherwise, the Court added, civil commitment would assume
    the prosecutorial functions of criminal law.  See id.

3.  Regarding the Adam Walsh Act's specific civil commitment
    provisions, the "serious difficulty refraining" has several

facets.  First, when an inmate suffers from Pedophilia,
"the nature of [the inmate's] prior crimes provides a
critical answer" to the issue of whether that person will
have serious difficulty refraining from sexually violent
conduct or child molestation if released.  United States v.
Wooden, ___ F.3d ___, No. 11-7226, slip op. at 32 (4th Cir.
Sept. 6, 2012).

4.    Second, while the "decreasing frequency of [an inmate's]
prison infractions is also relevant, so too is the nature
of those infractions."  Id.

5.    Third, both the substance of a respondent's testimony as
well as the manner in which a respondent testifies "provide
critical insight into the degree to which [an inmate] would
be able to control his deviant sexual interests should he
be released."  See id. at 33-35.

6.    Fourth, the "serious difficulty refraining" prong does not
require the fact-finder to determine "exactly how likely
[the inmate] is to reoffend."  Id. at 37 (quoting United
States v. Hunt, 643 F. Supp. 2d 161, 180 (D. Mass. 2009)).[7]

7.    However, recidivism rates are circumstantially relevant
"because offenders who continually expose themselves to

_____

[7] In Crane, the Supreme Court expressed this sentiment by
stating, "in cases where lack of control is at issue, inability
to control behavior will not be demonstrable with mathematical
precision."  Crane, 534 U.S. at 413 (internal quotations
omitted).

punishment may be presumed to have the most difficulty refraining from sexual reoffending." Id.

8.  In accordance with the Fourth Circuit's opinion in Wooden, the court considered the nature of Respondent's prior crimes, given that Respondent suffers from Pedophilia. Respondent has an extensive criminal history, comprised of both sexual and non-sexual offenses.  Notably, most of Respondent's sexual offenses have been the most recent of his criminal offenses and all of Respondent's sexual offenses, according to the evidence, involve child molestation.  In accordance with Wooden, this court concludes that the nature of Respondent's prior crimes, no matter that they were committed between nineteen and twenty-eight years ago, weigh in favor of concluding that Respondent would have serious difficulty in refraining from child molestation if released.

9.  Also in accordance with Wooden, the court weighed the decreasing frequency of Respondent's prison infractions against the nature of those infractions.  Both the 2005 incident at FCI Pekin as well as the 2011 incident at FCI Butner demonstrate Respondent's difficulty refraining from sexually inappropriate behavior as well as his unwillingness to follow prison rules regarding sexual behavior.  Especially disturbing is the nature of the 2005

incident where Respondent presumably "groomed" a younger, naïve, and cognitively impaired inmate. Respondent characterized his sexual conduct with the inmate as "consensual," but as Dr. Demby noted in her testimony, consent is problematic when a cognitively impaired person is involved. Moreover, whether Respondent's conduct with the inmate was consensual is of questionable relevance since even consensual sexual conduct between inmates demonstrates a disregard for prison rules. This same rationale applies to the 2011 incident between Respondent and detainee Timms. Accordingly, the nature of Respondent's prison infractions, no matter their decreasing frequency, weighs in favor of concluding that Respondent would have serious difficulty in refraining from child molestation if released.

10. The court has already discounted Respondent's testimony for its truth value. However, Respondent's inconsistent reasons for abusing children in the past—"I took a chance" as well as I did it for "the pleasure"—indicate, at best, that Respondent lacks insight into his mental illnesses. Moreover, stating on the one hand that he believed he does not need sex offender treatment, but on the other hand he would attend if required further supports this conclusion. Denying the need for treatment while being willing to

simply "go through the motions" not only shows Respondent's lack of insight into his mental illnesses; it suggests Respondent is willing to do or say whatever is most advantageous for him at that moment. This is a hallmark characteristic of both Antisocial Personality Disorder as well as Psychopathy according to Dr. Hoberman and Dr. Demby. Accordingly, the nature of the particular inconsistencies in Respondent's testimony weigh in favor of concluding that Respondent would have serious difficulty refraining from child molestation if released.

11. In all of the risk assessment actuarials used to evaluate Respondent's risk of sexually re-offending, including the one that Respondent's own expert witness used, Respondent placed in the highest risk categories. The percentages associated with those categories vary across actuarials. However, the precise number values that the actuarials spat out are less important than the fact that all the actuarials, by their own terms, classified Respondent as at high risk for re-offending. Because recidivism rates are circumstantially relevant, however, it is fair to use the actuarials' consensus as an indicator that Respondent would likely sexually reoffend if released. In other words, Respondent "may be presumed to have the most difficulty refraining from sexual reoffending." Wooden, slip op. at

37.  Accordingly, the circumstantial value that the actuarials provide weigh in favor of concluding that Respondent would have serious difficulty refraining from child molestation if released.

12.  Although the SPJ-based and the "dynamic factors"-based instruments target areas of risk management for a given individual and do not assess their risk for re-offense, these instruments do demonstrate Respondent's extreme need for treatment.  This evidence both discounts Respondent's testimony that he does not need treatment and demonstrates that, without meaningful treatment, Respondent would have more difficulty refraining from child molestation. Accordingly, the evidence presented by both the SPJ-based and "dynamic factors"-based psychological instruments weighs in favor of concluding that Respondent would have serious difficulty refraining from child molestation if released.

13.  Finally, looking at the Respondent's overall condition at present, the combination of (1) the "grip strength" his multiple mental illnesses have over him, Wooden, slip op. at 25, (2) the poor prognosis of Dr. Hoberman and Dr. Demby's evaluations of the Respondent, and (3) Respondent's unwillingness to undergo treatment and take it seriously indicate that Respondent's mental health has not changed

over his approximately twenty years of incarceration. Even Respondent's own expert witness implicitly agrees with this conclusion when he emphasizes the only factor that has inevitably changed over that time—Respondent's age.

14. Accordingly, the court finds, by clear and convincing evidence, that if released, Respondent would have serious difficulty refraining from sexually violent conduct or child molestation as a result of his serious mental illnesses.

## CONCLUSION

1. The government has proven, by clear and convincing evidence, that each of the three prongs required by 18 U.S.C. § 4248 have been met. The government has likewise proven that Respondent is a "sexually dangerous person" under the Adam Walsh Act.

2. Accordingly, the court finds and concludes that Respondent must be committed to the custody of the Attorney General until he is no longer a "sexually dangerous person" under the Adam Walsh Act.

IT IS SO ORDERED, this 7th day of November, 2012

ENTER:

David A. Faber
Senior United States District Judge